# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |
|---|---|
| MARILYN OVERALL, on behalf of herself, individually, and on behalf of all others similarly situated, | Civil No. 13-cv-11396-AC-LJM |
|  | Hon. Avern Cohn |
| Plaintiff, |  |
|  | **MOTION FOR LEAVE TO FILE BRIEF** |
| v. | ***AMICUS CURIAE* AND BRIEF *AMICUS*** |
|  | ***CURIAE* OF THE BECKET FUND** |
| ASCENSION HEALTH, *et al.*, | **FOR RELIGIOUS LIBERTY** |
|  | **IN SUPPORT OF DEFENDANTS** |
| Defendants. |  |

Eugene Volokh (California Bar #194464)
UCLA First Amendment Amicus Brief Clinic
UCLA School of Law
405 Hilgard Ave.
Los Angeles, CA 90095
Telephone:  (310) 206-3926
Facsimile: (310) 206-7010
E-mail:  volokh@law.ucla.edu

Eric Rassbach (DC Bar No. 493739)
The Becket Fund for Religious Liberty
3000 K St. NW, Suite 220
Telephone:  (202) 349-7214
Facsimile: (202) 955-0090
E-mail:  erassbach@becketfund.org

Daniel P. Dalton (Michigan Bar No. P44056)
Dalton & Tomich plc
41000 Woodward Avenue | Suite 345 East
Bloomfield Hills MI 48304
Telephone:  (248) 971-2400
Facsimile:  (248) 971-1906
E-mail:  ddalton@daltontomich.com

**Counsel for *Amicus Curiae***
**The Becket Fund for Religious Liberty**

**MOTION FOR LEAVE TO FILE BRIEF *AMICUS CURIAE***

The Becket Fund for Religious Liberty respectfully moves the Court for leave to file the attached brief *amicus curiae* in support of Ascension Health's motion to dismiss the complaint in this action, filed by Marilyn Overall. Counsel for the Becket Fund have reviewed Overall's complaint in this action, and the Becket Fund believes it can assist the Court in resolving a key issue raised by Overall's complaint: whether the church plan exemption violates the Establishment Clause of the First Amendment.

The Becket Fund is a non-profit law firm dedicated to the free expression of all religious traditions. It has represented agnostics, Buddhists, Christians, Hindus, Jews, Muslims, Santeros, Sikhs, and Zoroastrians, among others, in lawsuits across the country and around the world. Based on this experience, the Becket Fund is concerned that adopting the plaintiff's Establishment Clause theory in this case would impermissibly entangle the state in religious decision-making, and pressure religious institutions to change their religious practices.

The proposed *amicus* brief attached to this motion elaborates on this, supplementing the parties' briefs and, Becket hopes, aiding the Court in making its decision on Ascension's motion to dismiss. The *amicus* brief expresses no opinion on whether Ascension is statutorily entitled to the "church plan" exemption.

Participation as an *amicus* is "a privilege within 'the sound discretion of the courts,' depending upon a finding that the proffered information of amicus is timely, useful, or otherwise necessary to the administration of justice." *United States v. Michigan*, 940 F.2d 143, 165 (6th Cir. 1991). "Generally, courts have exercised great liberality in permitting an *amicus curiae* to file a brief in a pending case . . . . There are no strict prerequisites that must be established prior to

qualifying for amicus status; an individual seeking to appear as *amicus* must merely make a showing that his participation is useful to or otherwise desirable to the court." *Merritt v. McKenney*, 2013 WL 4552672, *3 (N.D. Cal. Aug. 27, 2013) (quoting *In re Roxford Foods Litig.*, 790 F. Supp. 987, 997 (E.D. Cal. 1991) (quoting *United States v. Louisiana*, 751 F. Supp. 608, 620 (E.D. La. 1990))).

The Becket Fund is appearing in this case because of the potential ramifications, beyond the parties in this case and beyond the specific context of ERISA, of any possible decision to hold the "church plan" exception unconstitutional. In furtherance of its mission, the Becket Fund seeks to maintain the constitutionality of legislative exemptions for religious institutions, and advocate against the creation of new precedents that would undermine such exemptions. Because Becket represents the broader interests of religious institutions and religious believers, the proposed *amicus* brief provides arguments that go beyond those set forth in the parties' briefs, and that constitute "proffered information of amicus" that Becket hopes will be "useful" to the court's deliberations, *United States v. Michigan*, 940 F.2d at 165. The brief will also be useful to the Court because it fills out the full range of arguments that will likely be before the Sixth Circuit in the event of an appeal.

Accordingly, the Becket Fund respectfully requests leave to file the attached *amicus* brief. Defendants Ascension Health *et al.* have consented to the filing of this brief. Counsel for amicus emailed counsel for plaintiff Marilyn Overall on October 8, 2013 and held a telephone conference with counsel for plaintiff on October 9, 2013. Counsel for *Amicus* requested but did not obtain concurrence in this motion.

MOTION FOR LEAVE TO
FILE BRIEF *AMICUS CURIAE*
Case No. 13-cv-11396-AC-LJM

DATED:   October 9, 2013

Respectfully submitted,

By:     /s/ Daniel P. Dalton

Daniel P. Dalton (Michigan Bar No. P44056)
Dalton & Tomich plc
41000 Woodward Avenue | Suite 345 East
Bloomfield Hills MI 48304
Telephone:  (248) 971-2400
Facsimile:  (248) 971-1906
E-mail:  ddalton@daltontomich.com

Eugene Volokh (California Bar #194464)
UCLA First Amendment Amicus Brief Clinic
UCLA School of Law
405 Hilgard Ave.
Los Angeles, CA 90095
Telephone:  (310) 206-3926
Facsimile: (310) 206-7010
E-mail:  volokh@law.ucla.edu

Eric Rassbach (DC Bar No. 493739)
The Becket Fund for Religious Liberty
3000 K St. NW, Suite 220
Telephone:  (202) 349-7214
Facsimile: (202) 955-0090
E-mail:  erassbach@becketfund.org

**Counsel for *Amicus Curiae***
**The Becket Fund for Religious Liberty**

MOTION FOR LEAVE TO
                            FILE BRIEF *AMICUS CURIAE*
                            Case No. 13-cv-11396-AC-LJM

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MARILYN OVERALL, on behalf of herself, individually, and on behalf of all others similarly situated,

                Plaintiff,

v.

ASCENSION HEALTH, *et al.*,

                Defendants.

Civil No. 13-cv-11396-AC-LJM

Hon. Avern Cohn

**BRIEF *AMICUS CURIAE* OF THE BECKET FUND FOR RELIGIOUS LIBERTY FOR RELIGIOUS LIBERTY IN SUPPORT OF DEFENDANTS**

Eugene Volokh (California Bar #194464)
UCLA First Amendment Amicus Brief Clinic
UCLA School of Law
405 Hilgard Ave.
Los Angeles, CA 90095
Telephone:  (310) 206-3926
Facsimile: (310) 206-7010
E-mail:  volokh@law.ucla.edu

Eric Rassbach (DC Bar No. 493739)
The Becket Fund for Religious Liberty
3000 K St. NW, Suite 220
Telephone:  (202) 349-7214
Facsimile: (202) 955-0090
E-mail:  erassbach@becketfund.org

Daniel P. Dalton (Michigan Bar No. P44056)
Dalton & Tomich plc
41000 Woodward Avenue | Suite 345 East
Bloomfield Hills MI 48304
Telephone:  (248) 971-2400
Facsimile:  (248) 971-1906
E-mail:  ddalton@daltontomich.com

**Counsel for *Amicus Curiae*
The Becket Fund for Religious Liberty**

# TABLE OF CONTENTS

MOTION FOR LEAVE TO FILE BRIEF *AMICUS CURIAE* ........................................................ ii

TABLE OF CONTENTS ........................................................................................................... 2

TABLE OF AUTHORITIES ...................................................................................................... 3

INTEREST OF THE *AMICUS CURIAE* .................................................................................... 5

SUMMARY OF ARGUMENT ................................................................................................... 5

DISCUSSION .......................................................................................................................... 6

I.    The Establishment Clause lets Congress exempt religious organizations from generally applicable laws, except when an exemption would constitute selective government sponsorship of religious evangelization ............................................................ 6

     A.    A religious exemption does not violate the Establishment Clause simply by exempting religious institutions but not secular institutions ........................................... 8

     B.    A religious exemption only violates the Establishment Clause when it would constitute government sponsorship of religious evangelization .................................... 10

     C.    The ERISA "church plan" exemption does not violate the Establishment Clause ................................................................................................................... 12

II.   A religious institution that is statutorily eligible for a facially valid exemption ought not lose the exemption on the grounds that the institution is too ecumenical (or too parochial) ........................................................................................................................ 15

     A.    Such as-applied challenges to religious exemptions tend to lead to unconstitutional religious discrimination, entanglement, and endorsement ................ 16

     B.    Such as-applied challenges also tend to pressure religious institutions to change their religious practices .................................................................................. 20

CONCLUSION ....................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687 (1994) ................................ 7

*Colorado Christian Univ. v. Weaver*, 534 F.3d 1245 (10th Cir. 2008) ...................... 5, 16, 18, 19

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987) ................................................................................................ passim

*Cutter v. Wilkinson*, 544 U.S. 709 (2005) .................................................................... 8

*Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474 (6th Cir. 1995) ........... 9, 14

*Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985) ........................................ 11, 14

*Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136 (1987) .............................. 7

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694 (2012) .. 5, 13, 16

*Larson v. Valente,* 456 U.S. 228 (1982) ................................................................ 15

*New York v. Cathedral Academy*, 434 U.S. 125 (1977) .................................................... 16

*Spencer v. World Vision, Inc.*, 633 F.3d 723 (9th Cir. 2010). ........................................... 16

*Texas Monthly v. Bullock*, 489 U.S. 1 (1989) ....................................................... 10, 11

*Thomas v. Review Bd.*, 450 U.S. 707 (1981) ............................................................. 17

*Walz v. Tax Comm'n*, 397 U.S. 664 (1970) ........................................................... 17, 18

*Zorach v. Clauson,* 343 U.S. 306 (1952) .................................................................. 9

**Statutes and Rules**

10 U.S.C. § 774 ............................................................................................. 8

18 U.S.C. § 1955(e) ....................................................................................... 8

29 U.S.C. § 1003 ........................................................................................... 14

29 U.S.C. § 103 ............................................................................................. 12

29 U.S.C. § 1054 ........................................................................................... 12

29 U.S.C. § 1055 ........................................................................................... 12

BRIEF *AMICUS CURIAE*
Case No. 13-C-1450 TEH

29 U.S.C. § 1132 ............................................................................................. 13

29 U.S.C. § 1140 ............................................................................................. 12

29 U.S.C. §§ 1001-1011 ................................................................................. 12

29 U.S.C. §§ 1021-1023 ................................................................................. 12

42 U.S.C. § 12187 ............................................................................................. 8

42 U.S.C. § 2000e-1 .......................................................................................... 8

42 U.S.C. § 3607 ............................................................................................... 8

7 U.S.C. § 1902 ................................................................................................. 7

7 U.S.C. § 1906 ................................................................................................. 7

**Regulations**

21 C.F.R. § 1307.31 .......................................................................................... 8

**Other Authorities**

Douglas Laycock, *Regulatory Exemptions of Religious Behavior and the Original Understanding of the Establishment Clause*, 81 Notre Dame L. Rev. 1793 (2006)............. 6, 7

Lee T. Polk, 1 ERISA Practice & Litigation § 3:40 (2013)............................................. 12, 13

U.S. Dep't of Labor, *Guidance to Employee Benefit Plans on the Definition of "Spouse" and "Marriage" under ERISA and the Supreme Court's Decision in United States v. Windsor*, Technical Release No. 2013-04, http://www.dol.gov/ebsa/newsroom/tr13-04.html............................................................................................................... 12

4                                      BRIEF *AMICUS CURIAE*
                                       Case No. 13-C-1450 TEH

## INTEREST OF THE *AMICUS CURIAE*[1]

The Becket Fund for Religious Liberty is a non-profit law firm dedicated to the free expression of all religious traditions. The Becket Fund has represented agnostics, Buddhists, Christians, Hindus, Jews, Muslims, Santeros, Sikhs, and Zoroastrians, among others, in lawsuits across the country and around the world.

The Becket Fund has often advocated both as counsel and as *amicus curiae* to ensure religious freedom, by promoting exceptions to generally applicable laws that prevent government entanglement with religion. *See, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694 (2012)); *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245 (10th Cir. 2008). The Becket Fund is concerned that adopting plaintiff's theory in this case would impermissibly entangle the state in religious decision-making, and pressure religious institutions to change their religious practices. The Becket Fund expresses no opinion here on whether Ascension is statutorily entitled to the "church plan" exemption. It argues only that such an exemption is constitutionally valid on its face and would be constitutionally valid as applied.[2]

## SUMMARY OF ARGUMENT

Out of respect for religious freedom, legislatures have long provided religious groups with exemptions from generally applicable laws. This tradition continues to this day, with a vast range of state and federal statutes providing various exemptions for religious institutions or religious believers.

---

[1] No counsel for a party authored this brief in whole or part, nor did any person or entity, other than *amicus* or its counsel, make a monetary contribution to the preparation or submission of this brief, except that the UCLA School of Law has paid the preparation and submission costs.

[2] In this brief, *amicus* uses the term "church" as the IRS does, to refer to religious organizations of all faith backgrounds.

Plaintiff's Establishment Clause logic puts such exemptions in jeopardy unless they are made available to secular claimants as well, a result that would be inconsistent with the Supreme Court's Establishment Clause jurisprudence. Far from viewing exemptions of religious institutions as a way of impermissibly expanding the power of religion, the Supreme Court has celebrated such exemptions as a way to protect religious freedom and religious diversity. When the government chooses not to regulate religion, that constitutes a worthy separation between church and state—itself a value promoted by the Establishment Clause—rather than a violation of the Establishment Clause.

Moreover, when a statutory religious exemption is facially permissible, and a religious institution qualifies for the statutory exemption, the institution cannot then be stripped of that exemption in court on the grounds that the institution is supposedly too ecumenical (or too parochial). If Congress has the power to exempt religious groups from a law, then, once a group qualifies under the statutory exemption, that must be the end of the matter.

To hold otherwise would invite the sort of case-by-case inquiry into religious practice that produces the religious discrimination, government intrusion into religious life, and chilling effect on religious practice that the Religion Clauses prohibit. Such an outcome is inconsistent with the Nation's long tradition of providing statutory exemptions for religious institutions. The plaintiff's as-applied challenge therefore must fail, and the motion to dismiss should be granted.

## DISCUSSION

## I.     The Establishment Clause lets Congress exempt religious organizations from generally applicable laws, except when an exemption would constitute selective government sponsorship of religious evangelization

"From the late seventeenth century to the present, there is an unbroken tradition of legislatively enacted regulatory exemptions." Douglas Laycock, *Regulatory Exemptions of Religious Be-*

BRIEF *AMICUS CURIAE*
Case No. 13-C-1450 TEH

*havior and the Original Understanding of the Establishment Clause*, 81 NOTRE DAME L. REV. 1793, 1837 (2006). This tradition of choosing not to burden religious practice played a vital role in developing the modern understanding that government should remain neutral in religious affairs. *Id.* at 1839.

And this historical practice continues to this day. "There is ample room under the Establishment Clause for benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 334 (1987) (internal quotation marks omitted). The Supreme Court's "cases leave no doubt that in commanding neutrality the Religion Clauses do not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 705 (1994). The Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 144-45 (1987). Government *abstention* from regulating religious institutions is thus the antithesis of "establishment" of religion.

Given this longstanding tradition of accommodating religion when enacting generally applicable laws, it is unsurprising that, as the modern regulatory state has expanded, so have religious exemptions. There are currently over 2,000 state and federal statutes exempting religious groups from their coverage. Laycock, *supra,* at 1837. In the United States Code, for example, there are exemptions:

BRIEF *AMICUS CURIAE*
Case No. 13-C-1450 TEH

- in food inspection laws, allowing the preparation of food in accordance with religious practices;[3]

- in antidiscrimination laws, allowing religious groups to discriminate on the basis of religious affiliation and disability status;[4]

- in laws governing the armed forces, allowing those in the military to wear religious apparel while wearing their uniforms;[5] and

- in federal drug laws, for the religious use of controlled substances.[6]

Yet, under plaintiff's interpretation of the Establishment Clause, these well-established exemptions, as well as many others, would all be constitutionally suspect examples of government preference for religion. Plaintiff's theory cannot be, and is not, an accurate interpretation of the Establishment Clause.

### A.   A religious exemption does not violate the Establishment Clause simply by exempting religious institutions but not secular institutions

"A law is not unconstitutional simply because it *allows* churches to advance religion." *Amos*, 483 U.S. at 337 (emphasis in original). Rather, for an exemption to violate the Establishment Clause, "it must be fair to say that the *government itself* has advanced religion through its own activities and influence." *Id.* (emphasis in original).

---

[3] 7 U.S.C. §§ 1902(b), 1906.

[4] *See, e.g.*, 42 U.S.C. §§ 2000e-1 (religious groups exempt from Title VII's prohibition against religious discrimination), 3607 (religious groups may give preference to prospective tenants of the same religion), 12187 (religious organizations not required to comply with provisions of the ADA).

[5] 10 U.S.C. § 774.

[6] *See, e.g.*, 21 C.F.R. § 1307.31.

BRIEF *AMICUS CURIAE*
                                                  Case No. 13-C-1450 TEH

Consequently, the Supreme Court has upheld many exemptions that provide a benefit to religious groups, but not other groups. *See, e.g.*, *Cutter v. Wilkinson*, 544 U.S. 709 (2005) (upholding section 3 of the Religious Land Use and Institutionalized Persons Act of 2000, which presumptively requires federal prisons to accommodate federal inmates' religious practices); *Amos*, 483 U.S. at 329 (upholding Congress's decision to exempt churches from antidiscrimination laws, even as to employees such as building engineers); *Zorach v. Clauson,* 343 U.S. 306 (1952) (upholding state programs permitting public school children to leave school once a week for religious observance and instruction). The Supreme Court "has never indicated that statutes that give special consideration to religious groups are *per se* invalid." *Amos*, 483 U.S. at 338. To categorically invalidate such statutes "would run contrary to the teaching . . . that there is ample room for accommodation of religion under the Establishment Clause." *Id.* There is thus no requirement that a religious exemption "come[] packaged with benefits to secular entities." *Id.*

The Supreme Court has likewise rejected the view that a regulatory exemption is impermissible when it is not mandated by the Free Exercise Clause. "It is well established . . . that the limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause." *Id.* at 334 (internal quotation marks omitted). And the Sixth Circuit has followed the Supreme Court's lead. *See Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1483 (6th Cir. 1995) (upholding a statutory accommodation that was not required by the Free Exercise Clause, on the grounds that, "[t]he statute at issue in this litigation does not evidence governmental advancement of religion merely because special consideration is given to religious groups.").

And courts have rejected the view that religious exemptions are impermissible just because they indirectly deny a benefit to a third party. *Amos* is again illustrative. Title VII's general pro-

9                     BRIEF *AMICUS CURIAE*
Case No. 13-C-1450 TEH

hibition against religious discrimination would certainly have benefited the employee who lost his job, yet the Supreme Court upheld a religious exemption from that provision. *See Amos*, 483 U.S. at 338-39.

**B.     A religious exemption only violates the Establishment Clause when it would constitute government sponsorship of religious evangelization**

This is not to say that the Supreme Court would permit every exemption enjoyed by a religious institution. "At some point, accommodation may devolve into an unlawful fostering of religion," *Amos*, 483 U.S. at 334-45, when the "*government itself*" has sponsored religion through the government's "own activities and influence," *id*. at 337 (emphasis in the original).

But the Supreme Court has found such unlawful fostering only when an exemption directly and preferentially subsidizes religious communication. *See Texas Monthly v. Bullock*, 489 U.S. 1 (1989). In *Texas Monthly*, six Justices struck down a Texas sales tax exemption for "[p]eriodicals that are published or distributed by a religious faith and that consist wholly of writings promulgating the teaching of the faith and books that consist wholly of writings sacred to a religious faith." *Id*. at 5. The majority, though, was fractured, with three opinions expressing differing rationales for invalidating Texas's exemption.

Justice Brennan's lead opinion, joined by Justices Marshall and Stevens, embraced a broad theory that tax exemptions directed exclusively at religious organizations are unconstitutional in many cases. *Id*. at 14-15. But Justice Blackmun's concurrence, which Justice O'Connor joined, rejected the lead opinion's "subordinati[on of] the Free Exercise value" of the First Amendment. *Id*. at 27 (Blackmun, J., concurring in judgment). Instead, Justices Blackmun and O'Connor insisted on a more "narrow resolution" of the case, focused on the fact that the law exempted the sale of *religious literature* by religious organizations. *Id*. at 28. Texas, they reasoned, had "en-

BRIEF *AMICUS CURIAE*
                                                     Case No. 13-C-1450 TEH

gaged in *preferential support for the communication of religious messages*"—"a statutory preference *for the dissemination of religious ideas.*" *Id.* (emphasis added). Because the lead opinion agreed with Justices Blackmun and O'Connor on this point, the only binding precedent that *Texas Monthly* set is that the government may not selectively subsidize religious evangelization. *See id.* at 15 (opinion of Brennan, J.) (specifically noting that the case involved a "subsidy . . . targeted at writings that promulgate the teachings of religious faiths").

And Justice White's concurrence in the judgment is consistent with this holding, though it relied on the Free Press Clause rather than on the Establishment Clause. Justice White reasoned that the exemption violated the Free Press Clause because the preference for religious evangelization impermissibly discriminated on the basis of the content of speech. *Id.* at 25 (White, J., concurring in judgment).

Plaintiff's invocation of Justice Blackmun's *Texas Monthly* concurrence for the argument that exemptions generally cannot flow solely to religious groups is thus misplaced. Plaintiff's Resp. in Opp. to Def. Mot. to Dismiss ("Opp.") 37-38. That proposition, as applied beyond the narrow zone of exemptions for religious evangelization, has never gained the support of five members of the Supreme Court, while the contrary proposition has. *See Amos*, 483 U.S. at 338.[7]

---

[7] The Supreme Court has also held that a state government cannot categorically require that private employers give Sabbatarians their preferred day off, no matter the cost to the employer. *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 708 (1985). But such an across-the-board legal obligation imposed on private third parties is the opposite of laws *exempting* religious organizations from legal obligations.

BRIEF *AMICUS CURIAE*
                                              Case No. 13-C-1450 TEH

**C.     The ERISA "church plan" exemption does not violate the Establishment Clause**

Applying these principles to ERISA's church plan exemption shows that the exemption is simply another example of "the benevolent neutrality the Establishment Clause" allows, *Amos*, 483 U.S. at 334, much like the many regulatory exemptions the Supreme Court has approved.

ERISA imposes strict and pervasive requirements on plan sponsors that are covered by the statute. For instance, absent the exemption, sponsors would be subject to ERISA's pension plan participation and coverage requirements, under which sponsors would have to determine the rate at which pension benefits accrue without reference to an employee's age. Sponsors would likewise have to provide postretirement survivor annuities to married employees, with "marriage" defined by the state from which the beneficiary received a marriage license.[8] Sponsors would have to vest pension benefits, even when members leave the organization. See 29 U.S.C. §§ 1001-1011, 1054(b)(1)(H), 1055.

Sponsors of defined-benefit plans would have to annually provide the Department of the Treasury and the Department of Labor with a detailed financial statement on the plan's assets, liabilities, and investments, as well as an actuarial statement and other information about the operation of the plan. *Id.* §§ 103, 1021-1023. Employees who are discharged, demoted, or not promoted by an employer would be able to sue, claiming that the real reason for the employment action was a desire to prevent them from exercising rights under the benefit plan. *Id.* § 1140.

And sponsors would have a fiduciary duty to invest the funds in the financial interests of the beneficiaries, and—notwithstanding plaintiff's claims to the contrary, Opp. 43—may thus be

---

[8] U.S. Dep't of Labor, *Guidance to Employee Benefit Plans on the Definition of "Spouse" and "Marriage" under ERISA and the Supreme Court's Decision in United States v. Windsor*, Technical Release No. 2013-04, http://www.dol.gov/ebsa/newsroom/tr13-04.html.

BRIEF *AMICUS CURIAE*
                                                                          Case No. 13-C-1450 TEH

constrained in their ability to engage in what they see as socially responsible investment. "The risk-averse fiduciary will avoid activity that could be construed as symptomatic of nonfinancial motives, such as social investing. The investment decisions of risk averse fiduciaries should be based exclusively on economic merit." *See*, *e.g.*, LEE T. POLK, 1 ERISA PRACTICE & LITIGATION § 3:40 (2013). "ERISA fiduciaries correctly understand that insofar as social investing is concerned, they do not have the same investment prerogatives as fiduciaries of state and local pension plans, church plans, and other programs not subject to ERISA." *Id.*

Requiring churches and church affiliated organizations to comply with these requirements increases the risk of government interference with religious practices, and increases the risk of government entanglement with churches' operation. Taoists, whose religious practices include especially honoring the elderly, could not give any preference to the elderly. Christians, Muslims, or Jews with religious objections to same-sex marriage would have to provide benefits to same-sex spouses. All religious groups would have to provide benefits once they have vested, even to those the organization regards as apostates or schismatics.

Religious groups would be constrained in their ability to avoid investments that are financially remunerative but, in the religion's view, sinful. And more church decisions about the firing, demotion, and nonpromotion of employees would be second-guessed, with judges and juries being asked to determine the true reason for an employment action. *Cf. Hosanna-Tabor*, 132 S. Ct. at 706 (noting that, for some job categories, such second-guessing would violate the Establishment Clause); *Amos*, 483 U.S. at 335-36 (noting the legitimate government purpose in abstaining from regulating church employment decisions, even when such abstention is not constitutionally required).

BRIEF *AMICUS CURIAE*
Case No. 13-C-1450 TEH

Not only would these groups be subject to Justice Department enforcement actions for violating these provisions, but the federal courts would inevitably become arenas for intrafaith civil disputes between churches and disgruntled members. 29 U.S.C. §§ 1132(a)(1), (2). Yet government is ill-placed to referee schisms.

The Establishment Clause allows Congress to avoid such entanglement by exempting religious institutions from such statutory schemes. "[I]t is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 335; *Dayton Area Visually Impaired Persons*, 70 F.3d at 1483 (upholding an exemption for religious charities on the grounds that "the religious exemption itself actually helps ensure that the government will not become unnecessarily *entangled* in religious affairs") (emphasis original). Just as Congress was entitled to conclude that state and local governments should be spared the burden and intrusion of federal regulation of benefit plans, see 29 U.S.C. § 1003(b)(1) (exempting state and local government plans), so it was entitled to conclude the same as to church plans.

Nor does the ERISA church-plan exemption provide any preferential support for the communication of religious messages or dissemination of religious ideas. The exemption may free up resources for Ascension, which may indirectly let Ascension do many other things, including spread its message. But, as *Amos* made clear, such effects of religious exemptions do not constitute unconstitutional government sponsorship of religion. ERISA's church plan exemption was thus a permissible way for Congress to "minimize governmental interfer[ence] with the decision-making process in religions." *Amos*, 483 U.S. at 336.

Plaintiff argues, citing *Thornton v. Caldor*, Opp. 45-47, that the church plan exemption places an undue burden on third parties. But the exemption does not impose any legal obligations on

14

BRIEF *AMICUS CURIAE*
Case No. 13-C-1450 TEH

private parties, which is what caused the law in *Thornton* to be struck down. 472 U.S. at 710; *Amos*, 483 U.S. at 337 n.15 (distinguishing *Thornton* on the grounds that the state law in *Thornton* "had given the force of law" to the employee's religious practice). Church plan beneficiaries do not get various legal benefits associated with ERISA, but that simply leaves them in the same position that everyone was in before ERISA was enacted, and the same position that members of state and local government plans are in today. This case is in this respect much like *Amos*, where the Title VII exemption that the Court upheld left church employees without the protection of the Title VII ban on religious discrimination, the same position that everyone was in before Title VII was enacted.

Likewise, rival non-government-run secular hospitals are not burdened with any legal duty to accommodate Ascension's religious practices, or for that matter to interact with such practices in any way. If secular hospitals want to object to the church plan exemption (plaintiff simply speculates that they might)—or for that matter, to the similar exemption for state or local governments—such objections should be addressed to Congress, not to the courts.

## II.    A religious institution that is statutorily eligible for a facially valid exemption ought not lose the exemption on the grounds that the institution is too ecumenical (or too parochial)

Because it was permissible for Congress to forgo including church plans in ERISA's regulatory scheme, a decision that Ascension statutorily qualifies for a church plan must be the end of the inquiry. In some cases (though not this one), the Establishment Clause could theoretically lead to the conclusion that a generally applicable regulatory exemption would be facially invalid, because it would constitute impermissible government sponsorship of religion. But if an exemption is facially valid and a religious organization is statutorily entitled to it, the organization can-

BRIEF *AMICUS CURIAE*
Case No. 13-C-1450 TEH

not lose that exemption on the grounds that the organization is somehow too ecumenical—or, for that matter, too parochial or too pervasively religious.

Nondiscrimination among religions is "[t]he clearest command of the Establishment Clause." *Larson v. Valente,* 456 U.S. 228, 244, (1982). Allowing as-applied challenges to the coverage of certain religious groups would tend to violate this command, and would lead to more government entanglement with religion, not less.

### A.    Such as-applied challenges to religious exemptions tend to lead to unconstitutional religious discrimination, entanglement, and endorsement

Courts are constitutionally prohibited from interfering with a religious institution's definition of its own community, and involving themselves in ecclesiastical or theological decisions. *See Hosanna-Tabor*, 132 S. Ct. at 705-06.[9] It is improper for courts to "engage in . . . [an] inquiry into 'what does or does not have religious meaning [within a religious organization's mission].' . . . The very act of making that determination . . . runs counter to the 'core of the constitutional guarantee against religious establishment.'" *Spencer v. World Vision, Inc.*, 633 F.3d 723, 731 (9th Cir. 2010) (quoting *New York v. Cathedral Academy*, 434 U.S. 125, 133 (1977)).

As-applied constitutional challenges to religious exemptions, however, often thrust courts into precisely these sorts of ecclesiastical debates. They invite plaintiffs—much like the plaintiff in this case—to argue that, while a religious exemption may be "just right" on its face, a particular religious group is either too exclusive to be given the exemption (in which case the government would be seen as unduly supporting that group's doctrine) or too ecumenical (in which case the

---

[9] *Amicus* notes that plaintiff mischaracterizes *Hosanna-Tabor* (in which *Amicus* represented the petitioner church) when she emphasizes that the plaintiff in that case was "fired for a religious reason." Opp. 44. In fact, the Court unanimously held that whether there was a religious reason or not "misses the point of the ministerial exception" and was entirely irrelevant. *Hosanna-Tabor*, 132 S.Ct. at 709.

exemption is not really necessary). Such Goldilocks evaluations of religious doctrine yield the religious discrimination that the Religion Clauses prohibit. *See Spencer*, 633 F.3d at 732 (holding that "consideration" of whether a defendant is religious enough to qualify for a statutory exemption "contains the potential for discrimination amongst religious institutions"); *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008) (holding that consideration of whether an organization is "pervasively sectarian" and thus too religious to qualify for a benefit likewise constituted impermissible discrimination among religious institutions).

Moreover, such evaluations of religious doctrine would call for judgments about whether, for instance, a religious institution's actions were inconsistent with what is supposedly the institution's true doctrine—a judgment that secular courts are not allowed to make. Thus, for instance, plaintiff argues that "Ascension includes investing in high risk venture capital projects as part of its business plan, a practice which is not animated by the Gospel of Jesus Christ," Class Action Complaint ¶ 107, an assertion that is better suited for debate by theologians rather than for resolution by a civil court. Likewise, according to plaintiff, "[w]hether Defendants invest Plan assets pursuant to what is 'morally acceptable in light of Catholic social teaching and doctrine' is in dispute," Opp. 44 n.42. But there is no way for secular courts to resolve that dispute.

Similarly, plaintiff faults Ascension for allowing some of its hospitals to "engage[] in contraceptive sterilization procedures, even though these practices are considered immoral, illegal, and evil by the Catholic Church," Complaint ¶ 107. But "[p]articularly in this sensitive area [of religious exemptions], it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation." *Thomas v. Review Bd.*, 450 U.S. 707, 715 (1981). Unsurprisingly, the Court in *Amos* never suggested that a religious institu-

17

tion covered by the statutory exemption involved in that case could lose the exemption if a court concluded that the institution was not acting consistently with what the court saw as the institution's true religious "convictions."

The Supreme Court foreshadowed the unsoundness of investigating, case by case, the particular practices of statutory religious exemption beneficiaries when it refused to "justify the [property] tax exemption [for religious institutions] on the social welfare services or 'good works' that some churches perform." *Walz v. Tax Comm'n*, 397 U.S. 664, 674 (1970). "To give emphasis to so variable an aspect of the work of religious bodies would introduce an element of governmental evaluation and standards as to the worth of particular social welfare programs, thus producing a kind of continuing day-to-day relationship which the policy of neutrality seeks to minimize." *Id.*

That logic applies with equal force to case-by-case evaluations of the practices of religious organizations that are statutorily eligible for a facially permissible regulatory exemption. Forcing courts to determine whether a particular group's activities are too religious, too secular, or just religious enough would require that courts make judgments they are ill-equipped to make, inviting impermissible discrimination and entanglement. "[D]etermining whether an activity is religious or secular requires a searching case-by-case analysis. This results in considerable ongoing government entanglement in religious affairs." *Amos*, 483 U.S. at 343 (Brennan, J., concurring).

The Tenth Circuit's decision in *Colorado Christian University* illustrates the importance of avoiding such discrimination and entanglement. In that case, plaintiff challenged a state statute that prohibited the granting of scholarship money to "pervasively sectarian" institutions. The Tenth Circuit agreed, holding that the statute violated the Establishment Clause because it resulted in intrusive inquiries into contested religious beliefs and practices. *Id.* at 1261.

BRIEF *AMICUS CURIAE*
                                                Case No. 13-C-1450 TEH

For example, the statute required the agency tasked with administering the scholarship to "examine the educational policies of the governing board and match them against the officials' understanding of the religious doctrine." *Id.* at 1263. This sort of inquiry necessitates government entanglement with religion, because it requires government officials to make ecclesiastical judgments they are constitutionally prohibited from making, by looking at whether the policies of the governing board reflected a particular religion. In striking down the statute the court noted, "it is not for the state to decide what Catholic—or evangelical, or Jewish—'polic[y]' is." *Id.*

The Tenth Circuit also held that the statute led to religious discrimination, not just entanglement. Distinguishing religious institutions based on how "sectarian" they are, the court held, constitutes presumptively unconstitutional "discrimination 'on the basis of religious views or religious status.'" *Id.* at 1258 (citation omitted).

Yet plaintiff calls for this very sort of investigation into how pervasively religious an institution is, though they would use the investigation to disqualify institutions that they view insufficiently rigorous or too ecumenical, rather than the "pervasively sectarian" institutions disqualified in *Colorado Christian University*. Plaintiff points, for instance, to the facts that some of Ascension's facilities perform sterilizations, that the facilities provide non-denominational chapels, and that Ascension does not require prospective employees to be Catholic. Complaint ¶ 107. At bottom, this is nothing more than an argument that Ascension is not Catholic enough—that it is acting in a way "not animated by the Gospel of Jesus Christ," *id.*—and therefore should be stripped of the statutory exemption. But for the reasons given above, any such inquiry into the quality of Ascension's religiosity is not constitutionally permitted, much less constitutionally required.

BRIEF *AMICUS CURIAE*
Case No. 13-C-1450 TEH

**B.      Such as-applied challenges also tend to pressure religious institutions to change their religious practices**

Moreover, if plaintiff's arguments were accepted, Ascension—and other similarly situated hospital systems—would be pressured to change their religious practices. Some Catholic hospital systems, like Ascension, may wish to be ecumenical in their chapel services or their employment decisions, open in their disclosure of information, and deferential to patient desires to get certain medical procedures. But under the plaintiff's theory, such systems would be pressured to be more restrictive in order to maintain the church plan exemption that Congress provided them. In short, only those institutions that plaintiff deems sufficiently "orthodox" would enjoy any protection.

Different religious institutions and religious traditions have different views on the degree of ecumenicalism that they want to follow in their ministries. Congress deliberately exempted all church plans from ERISA, thus preventing any government entanglement in such decisions and avoiding any pressure for churches to change those decisions. But plaintiff's approach, if adopted, would require institutions to move either into the ecumenical, fully regulated camp, or to make their practices less open to non-adherents than they would prefer. There is no call for the legal system to pressure religious institutions in this manner.

## CONCLUSION

For these reasons, plaintiff's Establishment Clause claim (Count IX) fails as a matter of law. The motion to dismiss should be granted as to Count IX.

Respectfully submitted,

By:      /s/ Daniel P. Dalton

Daniel P. Dalton (Michigan Bar No. P44056)
Dalton & Tomich plc
41000 Woodward Avenue | Suite 345 East
Bloomfield Hills MI 48304
Telephone:  (248) 971-2400
Facsimile: (248) 971-1906
E-mail:  ddalton@daltontomich.com

Eugene Volokh (California Bar #194464)
UCLA First Amendment Amicus Brief Clinic
UCLA School of Law
405 Hilgard Ave.
Los Angeles, CA 90095
Telephone:  (310) 206-3926
Facsimile: (310) 206-7010
E-mail:  volokh@law.ucla.edu

Eric Rassbach (DC Bar No. 493739)
The Becket Fund for Religious Liberty
3000 K St. NW, Suite 220
Telephone:  (202) 349-7214
Facsimile: (202) 955-0090
E-mail:  erassbach@becketfund.org

**Counsel for *Amicus Curiae***
**The Becket Fund for Religious Liberty**

BRIEF *AMICUS CURIAE*
                     Case No. 13-C-1450 TEH

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2013, I electronically filed the foregoing paper with the Clerk

of the Court using the ECF system which will send notification of such filing to:

Lynn L. Sarko
Havila C. Unrein
Matthew M. Gerend
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel: 206-623-1900
Fax: 206-623-3384

Michael P. Coakley (P34578)
Mary Kate Griffith (P72284)
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson, Suite 2500
Detroit, MI 48226
Tel: (313) 963-6420

Howard Shapiro
Robert W. Rachal
Stacey C. S. Cerrone
PROSKAUER ROSE, LLP
650 Poydras Street, Suite 1800
New Orleans, LA 70130
Telephone: (504) 310-4085
Fax (504) 310-2022

By:      /s/ Daniel P. Dalton

Daniel P. Dalton (Michigan Bar No. P44056)
Dalton & Tomich plc
41000 Woodward Avenue | Suite 345 East
Bloomfield Hills MI 48304
Telephone:  (248) 971-2400
Facsimile:  (248) 971-1906
E-mail:  ddalton@daltontomich.com

.

22                              BRIEF *AMICUS CURIAE*
                                Case No. 13-C-1450 TEH